BAIRD TRANSFER COMPANY v. NASHVILLE & LEBANON TURNPIKE COMPANY.

Middle Section.  April 28, 1928.

Petition for Certiorari denied by Supreme Court, November 23, 1928.

318

Wm. A. Guild, of Nashville, for plaintiff in error.
Walter S. Faulkner, of Lebanon, for defendant in error.

FAW, P. J.  This is an action brought on December 8, 1925, before a Justice of the Peace of Davidson county, by J. E. Baird and H. O. Tilford (a partnership doing business under the name and style of Baird Transfer Company), for the use of J. E. Baird, against the Nashville & Lebanon Turnpike Company, a Tennessee corporation, to recover tolls aggregating $280, paid by plaintiff to defendant during the years of 1921, 1922 and 1923.

Plaintiff alleged that the aforesaid tolls had been wrongfully, illegally and unlawfully collected from plaintiff by defendant on trucks of plaintiff passing over defendant's turnpike road "between Nashville, Tennessee, and Lebanon, Tennessee." The real plaintiff is J. E. Baird, for whose use the suit is brought.

The case was carried by appeal of plaintiff from the judgment of the Justice of the Peace to the circuit court of Davidson county, where it was tried before the judge of the Second Circuit Court and a jury, and at the close of plaintiff's evidence the court, on motion of defendant, directed the jury to return a verdict for defendant, which was done, and the suit was dismissed and the costs adjudged against the plaintiff and his surety.

The plaintiff has brought the case to this court by an appeal in the nature of a writ of error from the action of the trial court in overruling his motion for a new trial. The only question for decision here is, whether or not the trial judge erred in directing a verdict for the defendant.

The proof introduced below and brought up in the transcript consists of the oral testimony of plaintiff, J. E. Baird, and the charter of the defendant Turnpike Company, which charter is contained in Chapter 15 of the Acts of 1835, and an amendment thereto in Section 1, Chapter 200, of the Acts of 1847.

As originally built and maintained for many years, and until a comparatively recent date, the Turnpike Company's turnpike road extended from the City of Nashville in Davidson county to the town of Lebanon in Wilson county,—a distance of thirty miles—and defendant maintained and collected toll at six tollgates, three of which were in Davidson county and three in Wilson county. Prior to the time the tolls involved in this suit were paid by plaintiff, the defendant sold that part of its road lying in Davidson county to the County Court of Davidson county, and thereafter collected no tolls in Davidson county; but at the time of the sale defendant moved the third gate from Nashville, which was the fourth gate from Lebanon, and which had theretofore been located in Davidson county, across the line into Wilson county, and thereafter, until a date subsequent to the transactions involved in this suit, defendant maintained four gates on the 16 1/3 miles of its turnpike road remaining in Wilson county.

Defendant had no lawful right to maintain more than three gates on its mileage in Wilson county, and in a suit brought by the State on relation of citizens of Wilson county, against the defendant Turnpike Company, the chancery court of Wilson county ordered the removal of the said fourth gate from Lebanon, but, on appeal, the Supreme Court, on February 7, 1925, held and adjudged that it was immaterial which of its gates the defendant company should remove; that it was only entitled to maintain three gates, but could locate them as it chose, so long as no two of them were nearer to each other than three miles, and so long as the first one did not approach the corporate limits of Lebanon more than one mile; and the decree of the chancery court was modified so as to eliminate the order directing the removal of the fourth gate from Lebanon. It does not appear from the record before us which of the four gates in Wilson county the defendant Turnpike Company removed in compliance with the decree of the Supreme Court.

For a number of years, including 1921, 1922 and 1923, the Baird Transfer Company operated a line of trucks, carrying freight for hire, between Lebanon and Nashville, and sometimes from Smithville, through Lebanon, to Nashville, and the testimony of plaintiff J. E. Baird shows that he paid (for the Baird Transfer Company) to defendant the tolls which he brings this action to recover. He paid the same tolls at each of the four gates then maintained by

defendant in Wilson county, but he did not object to or complain of the payment of tolls at any one of the gates except the fourth gate from Lebanon, which, for the sake of brevity, we will hereinafter refer to as the fourth gate (which was the first gate from Nashville).

It is quite obvious from the testimony of plaintiff J. E. Baird that, during the period of time in which he paid the tolls here in controversy, he believed, and acted on the theory, that defendant Turnpike Company had a lawful right to maintain its first, second and third gates from Lebanon and collect from him the tolls which he paid it at those gates, but that the fourth gate was not a "legal gate," and that defendant had no lawful right to collect tolls from him at the fourth gate.

We quote from the testimony of J. E. Baird as follows:

"Q. Mr. Baird, when you went through there, what occurred between you and this gate man? Did you pay willingly, or how was that paid? A. No, sir, I didn't pay at the first gate willingly, I mean the first gate out of Nashville.

"Q. What did you do? A. Sometimes I would run the account along, and the gatekeeper would say, 'they are going to have you arrested if you don't pay it,' and I would pay, and sometimes I would pay as I went. The tollkeeper told me they were going to sue me for the amount.

"Mr. Faulkner: I except to that, if your Honor please. Later on your Honor will see why I make the objection.

"Mr. Guild: It is part of the res gestae.

"Mr. Faulkner: Your Honor will see what I have got in mind; the statement he made to your Honor was that he would run along a while and then run an account and then the gatekeeper would say something to him about arrest; in other words, this Honorable Court knows under the Constitution you can't arrest for debt.

"The Court: Yes, I sustain the objection as to the statement of the gatekeeper; as to the conversation that was had with him at the time the payment was made, that might be competent.

"Mr. Guild: It is competent on this ground, if your Honor please; because this gateman told him he would be arrested if he didn't pay it, and that supports the claim of duress, because it is an illegal claim; and if that statement was made it is immaterial, whether it occurred at the time or subsequent. In other words, it is competent to show the circumstances of the payment.

"The Court: He can state he made it under protest. I will exclude the statement made by the gatekeeper, why he paid it.

"Mr. Guild: Q. Well, did you protest the payment of all these payments at that gate? A. At this lower gate I did, this one nearest Nashville.

"Q. Did you say anything to the gateman or any official of the company here about that being an illegal gate and their not being entitled to collect toll there? A. One time I gave a check to the gatekeeper and the check was turned down—didn't have enough money there to pay it—for that gate, and Mr. McFarland—I don't know whether this is competent or not, I don't know whether I am right or not.

"Well, you go on and tell. A. Mr. McFarland told Mr. Walker about it—I mean Mr. Faulkner, and Mr. Faulkner told me to fix it up. I had sold some stock at the stockyards and the man there hadn't turned my check in at the bank and the money wasn't there when the man went for it, and Mr. Faulkner or Mr. McFarland one told me to fix it up, or he either told Mr. McFarland there and he told me that. I told him I would fix it up.

"Q. I am not asking about the question of the check, I am talking about what you told him about it being an illegal gate, if any? A. That is what I was talking about; that check was for that gate, and I protested in paying the amount every time, every time I gave him a check for that gate, I told him every time it wasn't a legal gate.

"Q. Told him every time it wasn't a legal gate? A. Yes, sir, that is what I told him.

"Q. Well, did they keep on collecting for that gate? A. They kept on collecting until about September.

"Q. What September? A. I would have to look up that before I could give you the date.

"Q. Well, I mean did they keep on collecting during the periods set out in this warrant here? A. Yes, sir.

"Q. And you have paid on that particular truck at least $62.50 more than you should have paid, is that right? A. Yes, sir, I think it is really more than that.

"Q. Now, for the period from May 24, 1922, to December 25, 1922, you have got an item here of one truck, 150 tolls, seventy-five cents each, at $112.50. Did you make those trips? A. Yes, sir.

"Q. Did you pay at that gate? A. Yes, sir.

"Q. I don't mean at the time, but you did pay everything you owed? A. I paid everything I owed; sometimes I would pay them as I went through; sometimes it would run for a week and then I would give them a check for that.

"Q. You made that many trips through all four of these gates? A. Yes, sir.

"Q. At that period? A. Yes, sir.

"Q. Well, were you protesting, too, at that time? A. I was protesting the lower gate, the one nearest to Nashville.

"Q. Did they ever threaten to have you arrested if you didn't pay at that gate, Mr. Baird? A. Well, they gave the account to Mr. Walker to collect.

"Q. A lawyer representing the Turnpike Company? A. Yes, sir.

"Q. Well, did you pay that willingly, or not? A. No, sir, I gave a check for it; I wasn't in shape to have a lawsuit, and told him I wasn't wanting any lawsuit.

"Q. Did you say that to Mr. Walker? A. Mr. Walker didn't know anything about it. I gave him a check for it and that stopped it.

"Q. But you did tell the gatekeeper? A. Yes, sir.

"Q. Now, you have got another one here, from January 1, 1923, to September 1, 1923, 2 trucks, 140 tolls, at 75 cents each. $105.00; did you make those trips through all four of those gates? A. Yes, sir. We were going to Smithville at that time; going clear on through.

"Q. From Nashville to Smithville? A. Yes, sir.

"Q. Did you make the same protest? A. Yes, sir.

"Q. And did you pay under the same circumstances? A. Under the same circumstances, up until September 1, quit paying them.

"Q. How did you get through after that? A. Just drove on through.

"Q. After September 1, 1923. Now, you have got something down here from about January 1, 1915, to March 1, 1919, do you remember about how much that was? A. No, sir; that was before that, you see.

"Q. You don't remember what that was? A. No, sir.

"Q. So these items that I have mentioned here are all that you are suing for? A. Yes, sir.

"Q. You are claiming interest on that account, are you, Mr. Baird? A. Yes, sir.

"Q. You made demand before you brought this suit, did you? A. Yes, sir.

"Q. And did the company refuse to pay you anything?
A. Didn't pay me anything.

"Q. I say, did they refuse? A. Yes, sir.

"Q. You made the demand through me, I believe? A. Made it through you.

"Q. Before you ever brought this suit? A. Yes, sir."

CROSS-EXAMINATION:

"By Mr. Faulkner. For the defendant:

"Q. Mr. Baird, I believe you told his Honor that you would run this truck and that you would incur what the defendant, the Turnpike Company, would say was an indebtedness against you; and you would sort of keep up with it, too? A. Yes, sir, some.

"Q. And then that came at periods, at different periods, and they would get after you for a settlement and you would protest to the gatekeeper? A. To the gatekeeper."

No proof was offered tending to show how much of the sum which plaintiff seeks to recover was paid at the time plaintiff's truck passed through the gate or how much was charged to plaintiff's account and subsequently paid by check. There is no evidence that defendant, or its gatekeeper, at any time refused to permit plaintiff's truck to pass through the gate. The only reasonable inference from the proof is that it was optional with plaintiff whether the toll was paid at the time his truck passed through the gate or was charged to his account. There is no evidence that plaintiff was at any time placed under any sort of physical duress or compulsion. The only means open to defendant for the collection of tolls charged to plaintiff's account was by civil suit, and if defendant had no lawful right to collect such tolls, plaintiff could have interposed such illegality as a defense to any suit brought therefor. We are not aware of any law authorizing arrest and criminal prosecution for the nonpayment of tolls.

We are of the opinion that the tolls which plaintiff seeks to recover in this case were, in contemplation of law, paid voluntarily, and, that, notwithstanding his protest, plaintiff is not entitled to recover the sums thus paid.

"It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance, though the payer makes the payment expressly reserving his right to litigate his claim, or under the impression that the demand was legal. So it has been held that where one pays a part of a claim and in a suit to recover the balance it is decided that

there was no liability he cannot recover the part originally paid. The rule applies not only as between individuals but also to cases in which one of the parties is the government. But the government as well as individuals has power in all cases to waive the question of voluntary payment, and provide that any mistake shall be corrected and any excess of payment refunded by the officer receiving it." 21 R. C. L., pp. 141-143, Sec. 165.

"The reason of the rule that money voluntarily paid with full knowledge of the facts can never be recovered and its propriety are quite obvious when applied to a case of payment on a mere demand of money unaccompanied with any power or authority to enforce such demand, except by suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat with each other on equal terms, and if litigation is intended by the one of whom the money is demanded, it should precede payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence and afterwards suing to recover the amount paid. Otherwise, the privilege is left to him of selecting his own time and convenience for litigation, delaying it, as the case may be, until the evidence on which his adversary would have relied to sustain his claim may be lost by the lapse of time and the many casualties to which human affairs are exposed." Idem, p. 143, Sec. 166.

"A definition of voluntary payment is useful only to the extent that it gives the elements which must exist in order to make a payment voluntary. Each case must necessarily depend on its own peculiar facts. A rule which will furnish a safe guide in the determination of particular cases is that where a person pays an illegal demand, with a full knowledge of all the facts which render the demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment is voluntary; and the fact that the person making the payment files a written protest at the time does not change its character. The question whether a payment is voluntary or involuntary is one of law where the facts are undisputed, but when the facts are in dispute it is for the jury to say whether the money was paid voluntarily or in consequence of compulsion or duress." Idem, pp. 143-144, Sec. 167.

The rules and principles defining and governing voluntary payments as summarized in the foregoing quotations from Ruling Case Law are in accord with the adjudged cases in Tennessee. Dickens v. Jones, 6 Yerg. 483; Hubbard v. Martin, 8 Yerg. 498; Cauvin and Duprez v. Mayor, Etc., 3 Baxt., 453, 455; Gaar, Scott and Co. v. Stark (Tenn. Chy. App.), 36 S. W., 149, 153; Railroad v. Hamilton County, 120 Tenn., 1, 9, 113 S. W., 361; Leach v. Cowan, 125 Tenn., 182, 206, 140 S. W., 1070; Prescott v. City of Memphis, 154 Tenn., 462, 285 S. W., 587.

See also 30 Cyc., p. 1298 et seq., and 22 A. and E. Ency. of Law (2 Ed.), p. 609 et seq.

"Mere apprehension or threats of a civil proceeding to enforce a claim, unaccompanied by any act of hardship or oppression, does not render a payment in response thereto involuntary in a sense that it can be recovered back." 30 Cyc., p. 1306. To same effect see Railroad v. Hamilton County, supra, page 9.

We are of the opinion that the undisputed testimony of the plaintiff, J. E. Baird, shows that the payment of the tolls in question was, in a legal sense, voluntary, and that, for that reason, the defendant's motion for peremptory instructions was properly sustained. The judgment of the circuit court dismissing plaintiff's suit at his cost is therefore affirmed. The costs of the appeal will be adjudged against the plaintiff and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.